STATE of Minnesota, Respondent,

v.

Marvin Rudolph FREEMAN, Appellant.

No. C5–94–22.

Supreme Court of Minnesota.

April 28, 1995.

John M. Stuart, State Public Defender, Lawrence W. Pry, Asst. Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Margaret Chutich, Asst. Atty. Gen., St. Paul, and Alan Mitchell, St. Louis County Atty., Duluth, for respondent.

## OPINION

ANDERSON, Justice.

Defendant, Marvin Rudolph Freeman, was indicted on three counts of first-degree murder in the shooting death of his ex-wife, Sherry Kadin. At trial, Freeman proffered an alibi defense, maintaining that his car's malfunctioning condition prevented him from being at the crime scene. The trial court allowed the state to present evidence that Freeman's car was operable. The state obtained this evidence by inspecting Freeman's car, which involved testing various aspects of the car's electrical and mechanical systems. At the end of the trial, the jury found Freeman guilty of first-degree premeditated murder in violation of Minn.Stat. § 609.185(1) (1992). The court sentenced Freeman to a mandatory term of life imprisonment.

On appeal, Freeman maintains that the state's inspection irreparably altered his car's condition and thereby limited his ability to conduct subsequent tests, the results of which might have supported his alibi. Freeman claims that the state violated Minn. R.Crim.P. 9.01, subd. 1(4), by failing to give him notice before inspecting his car, and that the trial court abused its discretion by allowing the state to present evidence relating to the condition of his car. We hold that the court did not abuse its discretion in admitting evidence relating to the condition of Freeman's car, and we affirm.

In April 1984, defendant, Marvin Rudolph Freeman, married Sherry Kadin. They had two daughters and lived in Duluth, Minnesota. The couple reportedly experienced a turbulent marriage, which ended in divorce in February 1987.

After the divorce, Freeman's relationship with Kadin remained turbulent, and at times, it became contentious. For example, Freeman quarrelled with Kadin regarding child support and visitation arrangements. Pursuant to the divorce decree, Kadin had custody of the children, and Freeman was awarded visitation rights. On one occasion, when Kadin arrived late to exchange custody of the children, Freeman reportedly shook his fist at Kadin and yelled, "I'm really gettin' tired of this, having to chase you around to get the girls. I wish you'd get your shit together * * * one of these days * * * if you don't get your shit straightened out * * * I'm gonna kill you."

On June 16, 1992, Kadin reported to the Internal Revenue Service that Freeman had claimed exemptions on his tax return that he was not entitled to receive. As a result of the consequent audit, the IRS disallowed certain exemptions that had been claimed on the tax return and assessed $6,537 in additional tax and penalties. A short time later, Freeman called Kadin, informed her he knew she had reported him to the IRS, and warned her that she "better watch out."

On January 1, 1993, Freeman moved from his parents' home in Duluth to an apartment located in White Bear Lake, Minnesota. He moved because he was beginning a new job in the Twin Cities metropolitan area.

On Friday afternoon, January 29, 1993, Freeman left work early because he planned to travel from his home in White Bear Lake to Duluth, and he needed to make some repairs on his car before the trip. Although

Freeman maintained that he intermittently worked on his car in the parking lot of his apartment complex from approximately 3:30 p.m. to 8:30 p.m., a resident of his apartment complex, who wanted to ask Freeman a question, testified that Freeman's car was not present in the parking lot on any of the several occasions when she looked for it that afternoon and evening. That afternoon, Freeman pumped $11.50 worth of gasoline into his car, a blue-grey 1984 Oldsmobile Cutlass Ciera, presumably in anticipation of his trip. Freeman was going to Duluth to pick up his children because it was his weekend for visitation.

Freeman and Kadin's divorce agreement designated a gas station located in Duluth as the site where they were to exchange custody of their children. Because he would not be able to arrive in Duluth by the designated pick-up hour of 6:00 p.m., Freeman arranged for his parents to pick up the children. Kadin had moved that day from Duluth to Floodwood, Minnesota, and had asked Freeman to pick up the children in Floodwood, but Freeman objected to the change, and sent his parents to the court-designated Duluth exchange spot.

At approximately 6:40 p.m., Freeman's mother called him and informed him that Kadin had failed to bring the children to the designated exchange spot. Freeman called both the St. Louis County sheriff's office and the 911 nonemergency number to complain about the incident, but was instructed to consult his attorney because it was a civil matter. At 8:03 p.m., Freeman called his mother and told her what he had been told and also informed her that he would wait until the next morning to drive the nearly 142 miles from White Bear Lake to Duluth because it was too late to leave that night.

Meanwhile, Kadin had finished bringing the last of her belongings to Floodwood, and was preparing to go to work at Generations House. Generations House is a residential health care facility for paraplegic patients, located in Duluth on the corner of Second Street and North 19th Avenue East. Kadin worked as a personal care attendant for Jack Zenda, one of the three paraplegic patients residing at Generations House. Zenda lives in the upstairs apartment of Generations House, while two other patients live in the lower level's two apartments.

During November, December and January, Kadin always worked the night shift from 11:30 p.m. to 7:30 a.m. She typically walked the short distance from her apartment to work, stopping at a friend's home along the way. But on this evening, January 29, 1993, instead of walking, Kadin drove her mother's car to her friend's home, arriving at approximately 10:00 p.m. She left at approximately 11:20 p.m., driving the short distance to Generations House.

Jennifer Johnson also worked as a personal care attendant for a Generations House resident living in one of the two downstairs apartments. Sometime between approximately 1:30 a.m. and 2:00 a.m., now Saturday morning, January 30, 1993, she reportedly heard footsteps outside on the snow-covered deck that partly surrounds the first floor apartments.

At approximately 2:00 a.m., three blocks away from Generations House, a woman reportedly looked out the window of her home and saw a blue-grey car driving slowly down Fifth Street. The driver, dressed all in black, parked the car across the street from the woman's home, quietly shut the door, then quickly ran off, hunched over.

Zenda was having difficulty sleeping that night. Consequently, at 2:00 a.m. he was lying awake in his bed. His bedroom has no door on it, but instead, the doorway is covered by a blanket, which is usually pushed open. The only outside access to Zenda's upstairs apartment is from a ramp leading from Second Street. An interior stairway leading from the downstairs also provides access to the upstairs. As he lay awake, Zenda heard someone enter his apartment from the Second Street ramp. Then he heard Kadin scream, "Marv!" Then he heard a male voice say "I'll teach you," and then he heard two gun shots, separated by what sounded like the loading of a pump shotgun. Following the shots, Zenda heard the male voice say, "there," and finally he heard the person exit the apartment.

Johnson heard the shots from downstairs. She ran up the interior stairway, and once upstairs, she discovered Kadin lying face-down in front of the open door to the outside deck. Johnson yelled downstairs to the other personal care attendant and instructed the attendant to call 911 for an ambulance. This 911 call was received at 2:19 a.m.

Within minutes, paramedics arrived at the scene and used the ramp leading from Second Street to enter Zenda's apartment. Upon arrival, the paramedics smelled gunpowder, realized the apartment was an unsecured potential homicide scene, and called for police backup. Efforts to resuscitate Kadin were unsuccessful. An autopsy revealed Kadin died instantaneously from two bullet wounds to the back of her head. One bullet exited Kadin's head through her right eye, and the other was found in her brain during the autopsy and was seized as evidence.

Officers from the Duluth Police Department arrived on the scene at approximately 2:30 a.m. They, too, entered Zenda's apartment using the ramp leading from Second Street. On the floor near Kadin's body, police found a .22 caliber lead bullet and a brass .22 caliber shell casing, which was marked with the Winchester flying "W" headstamp. Police also observed a bullet hole in the ceiling, and later seized a .22 caliber lead bullet from the attic.

Upon learning that, shortly before the shooting, Johnson had heard footsteps on the deck outside the first floor apartments, police photographed several shoeprints located in that area. These shoeprints were left in approximately one-quarter of an inch of snow and gave the impression that the person who made them had attempted to look in the windows of the downstairs apartments. Because emergency personnel and police officers had repeatedly walked on the ramp leading from Second Street to Zenda's apartment, no identifiable shoeprints remained on the ramp.

While at Generations House, Sergeant Dennis Moyle of the Duluth Police Department learned that, just before the gunshots, Zenda had heard Kadin scream, "Marv!" This motivated Sergeant Moyle to call a phone number for a "Marv" that he had found in Kadin's purse. A few minutes before 4:00 a.m., Sergeant Moyle called the number. Freeman's father answered the phone and informed Sergeant Moyle that Freeman's first name was Marvin and that Freeman had been married to Kadin. Sergeant Moyle requested and obtained the phone number to Freeman's apartment in White Bear Lake, which he immediately called. Sergeant Moyle let the phone ring repeatedly until a phone company recording intervened and instructed him to hang up and to dial again. After hanging up, Sergeant Moyle called the White Bear Lake Police Department and requested that they pick up and hold Freeman as a suspect in Kadin's murder.

Officer Bruce Weber of the White Bear Lake Police Department responded to Sergeant Moyle's request at approximately 4:04 a.m. Officer Weber drove to Freeman's address in White Bear Lake, gained access to the apartment complex, and went to Freeman's apartment door, where he knocked and listened for any noise that might be emanating from inside. At approximately 4:10 a.m., Sergeant Moyle again called Freeman's apartment while Officer Weber was still at Freeman's apartment door. Officer Weber heard Freeman's phone ring repeatedly, but no one answered the phone and no one came to the door. Officer Weber returned to his squad car, obtained the license number and a description of Freeman's car, and began driving around the neighborhood in a spiral pattern in search of Freeman's car.

At approximately 5:20 a.m., Officer Weber spotted a 1984 grey-blue Oldsmobile Cutlass Ciera, which he identified as Freeman's car, and he followed it to the parking lot of Freeman's apartment complex. Freeman drove into the parking lot and parked in a space at an angle. Once stopped, Officer Weber shined his very powerful spotlight at Freeman. Freeman got out of his car, glanced in the direction of Officer Weber's squad car, and walked around his still-open driver's-side door to the front left corner of his car, in the direction of a large park. Officer Weber reported that, while walking, Freeman put his hands in the air with his

forearms extended at approximately ninety degrees from his elbows.

Concerned that Freeman intended to flee through the park, Officer Weber called out, "Marvin," identified himself as a police officer, and instructed Freeman to put his hands all the way up. Officer Weber then ordered Freeman to the rear of Freeman's car, where Officer Weber arrested him. Backup officers arrived at the arrest scene, and in a snowbank located approximately two feet in front of Freeman's car, one of the officers found an empty cardboard box of Winchester Wildcat brand .22 caliber long-rifle cartridges. It appeared to the officer that someone had stepped on the box to push it into the snowbank, leaving one end visible and the rest covered by snow. Although snow covered much of the box, the cardboard was firm, not damp. During cross-examination at trial, Freeman denied that he had dropped the box in the snowbank and also denied that he had attempted to conceal it, but Freeman did not deny that the box was his, stating, "I never said that it wasn't my—that it wasn't my box."

In addition to the empty cartridge box found at the arrest scene, the police obtained two boxes of Winchester Wildcat .22 caliber long-rifle cartridges from Freeman's gun cabinet located at his parents' home. One of these boxes was full, containing 50 cartridges, and the second contained 47 cartridges.

The police impounded Freeman's car. To preserve its condition, the car was transported from White Bear Lake to Duluth on a roll-back wrecker. A search of the trunk, made pursuant to a warrant, revealed only one item, a brown paper grocery bag. The grocery bag contained the following items: one pair of Turntec athletic shoes, one pair of brown pants, one black jacket with red stripes around the neck and lettering on the front, one light blue shirt, one black stocking ski mask, one black and pink baseball hat, one rag, one used handiwipe, one pair of apparently used latex gloves, and two pair of apparently unused latex gloves. Most of these items were slightly damp.

The floor of the trunk of the car had been lined with a bottom layer of brown paper grocery bags taped together with duct tape, and a top layer of white plastic garbage bags, which were also taped together. Freeman testified that he had lined his trunk to determine whether moisture in his trunk was caused by condensation or by leaking. But in rebuttal, a state's witness testified that the sealing gasket surrounding the perimeter of the trunk was perfectly intact, and no water staining indicating prior leakage existed in any part of the trunk area.

A search of the car's interior passenger compartment revealed many items that are typically stored in the trunk of a car. At trial, the prosecutor hypothesized that these items had been removed from the trunk and placed in the passenger compartment. In addition to these items, the search of the passenger compartment revealed what the prosecutor referred to as a "murder kit." This kit included, among other things, one pair of high-power binoculars, one partial roll of carpeting, an empty plastic rifle case, a large hunting knife, a smaller buck knife, a wrecking bar, two fabric web belts, a large flashlight, a roll of clear tape, and a set of court papers relating to child support.

At trial, the state's theory of the case was that Freeman drove from White Bear Lake to Duluth shortly after 8 p.m. on Friday night, intending to abduct Kadin as she walked to work. He had packed a murder kit, and he had removed the items kept in the trunk of his car and placed them in the passenger compartment. Finally, he had lined the trunk in preparation for transporting Kadin's body, but he had to change his plan when Kadin unexpectedly drove to work.

At trial, Freeman asserted an alibi defense, maintaining that on the night of Kadin's murder, he fell asleep at his apartment in White Bear Lake after informing his mother that he intended to leave for Duluth early the next morning. He later awoke, and while it was still dark outside, he began to drive to Duluth. Freeman testified that he was unsure of the time he began his trip because he did not look at a clock before he left. He maintained that, as he drove north on interstate 35, a warning light located on

his car's dashboard lit up several times and his headlights grew dim. He testified that these events motivated him to pull over to the side of the road. Concerned that his car's battery was not being properly charged because of a loose alternator belt, and concerned that driving the car might seriously damage its engine, Freeman maintained that he turned around at the first opportunity and returned to his apartment in White Bear Lake. Although over the course of the investigation Freeman stated inconsistent estimates of how long he had been driving before he turned around, he ultimately testified that he had been driving for approximately forty-five minutes before deciding to return to White Bear Lake.

Several items of evidence undermined Freeman's alibi defense. A forensic scientist at the Minnesota Bureau of Criminal Apprehension crime laboratory compared the size, angles and tread elements of the Turntec athletic shoes, which were found in the trunk of Freeman's car, with the photographs of the shoeprints found on the snow-covered deck at Generations House. The scientist determined that the shoeprints depicted in the photos corresponded very well to Freeman's Turntec shoeprint in size, shape and tread pattern, and concluded that Freeman's shoes could have made the shoeprints in the snow at the scene of the crime.[1]

A Federal Bureau of Investigation special agent assigned to the Elemental and Metals Analysis Unit in Washington, D.C. compared the metal composition of the three bullets fired at Generations House on January 30, 1993 (two bullets found at the crime scene and the one obtained during Kadin's autopsy) with eight bullets randomly selected from the full box of fifty cartridges retrieved from Freeman's gun cabinet.[2] The FBI special agent determined that the three[3] bullets found at the scene of Kadin's murder were of close compositional association with two of the eight bullets randomly selected from the full box of 50 cartridges retrieved from Freeman's gun cabinet.[4] The agent concluded that the three bullets found at the murder scene were manufactured by Winchester on the same day as the two bullets from the box of 50 cartridges retrieved from Freeman's gun cabinet. This box of 50 cartridges contained the same loading code, 2TB90L, as the empty cartridge box found in the snowbank at the scene of Freeman's arrest. This loading code indicated that the cartridges contained in both boxes were manufactured on February 9, 1982, during the second shift at Winchester's plant located in East Alton, Illinois.[5]

On February 1, 1993, Fred Friedman, Chief Public Defender for the Sixth Judicial District, visited Sergeant Moyle at the Duluth Police Department to encourage the po-

1. This type of Turntec shoe was sold between 1987 and 1989, and only eleven pair of this particular brand and size of shoe were sold in Minnesota, through one distributor in Duluth.

2. By analyzing six trace elements found in lead bullets, it is possible to determine whether two bullets have a common origin. The six trace elements include antimony, which bullet manufacturers purposefully include in lead bullets in specific desired percentages, and copper, arsenic, tin, silver, and bismuth, which are incidental contaminants. Because the neuron activation analysis testing technique is extremely precise and sensitive, and because trace elements are not homogenous, even in the same batch of lead, if two bullets show the same number of elements in exactly the same amounts, they are either analytically indistinguishable or of close compositional association.
   Significantly, when two bullets have a close compositional association, that indicates they were made on the same day, from the same part of the same batch of lead. Comparisons between bullets from the same box of cartridges always

reveal a few bullets having close compositional association. But comparisons between bullets manufactured at the same factory on different days reveal totally different compositions because the compositions change so quickly. Moreover, these differences increase significantly between bullets made by different manufacturers.

3. Although Zenda reported hearing two shots the night of Kadin's murder, three shots were apparently fired.

4. The composition of the three bullets fired at Generations House was totally different from six bullets randomly selected from the box of 47 cartridges that was also obtained from Freeman's gun cabinet located at his parents' home. The box of 47 cartridges, however, was not packaged on the same date as the box of 50.

5. Also, both boxes were labelled with a Target price tag indicating a cost of $1.39.

lice to examine Freeman's car. Although Mr. Friedman was not representing Freeman, he had visited Freeman as a favor and had learned that Freeman wanted somebody to inspect his car to verify his alibi that its malfunctioning prevented him from driving to Duluth. Mr. Friedman made the decision to tell the police that Freeman wanted his car inspected immediately.

Consequently, the police expedited the inspection that had been planned for Freeman's car. On February 5, 1993, Paul Brand, the state's automotive expert in this case, inspected Freeman's car at the Duluth Police Department garage. Because Freeman had reported that his car's charge light had lit up several times on the night of the murder and had complained that his car's headlights had grown dim, both indicative of an electrical system problem, Brand first tested the car's battery. Videotaping his inspection, while narrating into a remote microphone, Brand first removed the battery cables. Brand tested the battery, found it to be fully charged, and determined that the electrical and charging system was working normally.

Brand then examined the condition of the car's alternator belt. The alternator belt was shiny and was virtually new. It appeared to be somewhat loose, but not dramatically so, and there was no visual evidence of slippage, heat or wear. Using a metal dental pick and a felt-tipped pen, Brand marked the location of the pulley to preserve a record of the amount of tension existing in the alternator belt. Based on his inspection, Brand concluded that Freeman's car could have been driven round-trip from White Bear Lake to Duluth.

On February 22, 1993, Freeman moved for an order allowing his automotive expert to inspect his impounded car. Although Freeman's motion was granted on February 26, 1993, Freeman's automotive expert, Bradley Williams, first inspected Freeman's car on September 8, 1993. Williams had been provided with several police reports, Brand's automotive inspection report, and the narrated videotape that had been taken of Brand's inspection. Although Williams criticized Brand for conducting only the least important one of four tests that a battery must undergo to be considered a good battery, Williams testified that the car's starting system and charging system passed all the tests that he conducted on September 8.[6] Williams noted, however, that the battery and alternator belt had been replaced.[7]

Williams criticized Brand for not conducting a voltage drop test before removing the battery cables. By removing the battery cables and then reconnecting them, Williams explained, "cleaning" occurred, which precluded subsequent tests to determine the battery's precleaning voltage. Williams testified that a slipping alternator belt and a poor or corroded battery cable connection could have caused voltage fluctuations that would have manifested themselves in a manner consistent with Freeman's description of his car's malfunctioning. Nevertheless, Mr. Williams could not conclude that the car's hypothesized malfunctioning condition would have prevented Freeman from driving round-trip from White Bear Lake to Duluth.

Based on the state's failure to give him notice prior to inspecting his car, an alleged discovery violation, Freeman moved to exclude any evidence derived from the inspection that related to the condition of his car. The trial court denied Freeman's motion and allowed the state to present evidence that the car was operable.[8] Freeman now contends

---

6. If someone had told him they were having trouble with their alternator and their charge light came on, Williams would have checked the car's alternator output, the charging system, and the battery, which is consistent with what Brand did.

7. The police had removed the original battery from the car because, after six months of nonuse, parasitic loads had drained it so low that it would no longer hold a charge. Williams examined the original alternator belt, which the police had preserved in its original condition, and agreed that the belt appeared to be new, manifesting no signs of slipping. The belt's condition, however, did not mean slipping had not occurred.

8. The trial court conditioned its denial, directing the state to disclose to Freeman its documents and reports related to its automotive inspection. The state fully complied with that directive, providing both Freeman's attorney and Freeman's automotive expert with copies of or access to

he is entitled to a new trial, claiming that the court abused its discretion in admitting the evidence.

## I.

■ In the present case, the state used several devices to conduct mechanical and electrical tests of Freeman's car. Although the state went to great lengths to return Freeman's car to the condition it was in before it was examined, the state's removal of the car's battery cables resulted in "cleaning" any faulty or corrosion-affected connection. Freeman maintains that the state's automotive tests irreversibly altered the condition of his car, thereby limiting the ability of his automotive expert to conduct subsequent tests, the results of which might have corroborated Freeman's alibi.[9] Because the state failed to give him notice before inspecting his car, Freeman claims the state violated Minn.R.Crim.P. 9.01, subd. 1(4).

■ Minn.R.Crim.P. 9.01, subd. 1(4) requires the state to give notice to a defendant before conducting any scientific test or experiment that may preclude any further tests or experiments. *Cf. State v. Carlson*, 267 N.W.2d 170, 175 n. 4 (Minn.1978) (observing that when chemical analysis of a bloodstain may require the total exhaustion of the available physical evidence, the better practice

dictates that the defendant be notified of the proposed testing so that the defendant's own expert can be present, if the defendant so desires), *reh'g denied* (Minn., July 12, 1978). The rule provides:

> *Reports of Examinations and Tests.* The prosecuting attorney shall disclose and permit defense counsel to inspect and reproduce any results or reports of physical or mental examinations, scientific tests, experiments or comparisons made in connection with the particular case. If a scientific test or experiment of any matter, except those conducted under Minn.Stat. Ch. 169, may preclude any further tests or experiments, the prosecuting attorney shall give the defendant reasonable notice and an opportunity to have a qualified expert observe the test or experiment.

■ Although we have not had the opportunity to interpret the scope of the *notice* requirement found in Rule 9.01, subd. 1(4),[10] we need not do so in the present case because even if the state's failure to give Freeman prior notice violated Rule 9.01, subd. 1(4), we conclude that the trial court did not abuse its discretion in admitting evidence obtained during the inspection. Once a discovery violation has occurred, the trial court is particularly suited to determine the appro-

various police reports, automotive inspection reports and the videotape taken during the state's inspection of Freeman's car.

9. When the state's automotive expert, Brand, removed the cables from the battery of Freeman's car, Brand erased any trouble codes that might have been recorded in the car's computer. Computer trouble codes are numerical indicators stored in the computer any time a problem arises with engine devices such as the engine management system. Freeman's brief criticized Brand for failing to check the car's computer for trouble codes before erasing them by disconnecting the battery cables. At oral argument, however, Freeman abandoned any contention that he is entitled to a new trial because the state might have erased trouble codes.

10. We have interpreted the scope of the *disclosure* requirement found in Rule 9, subd. 1(4) in cases involving scientific analysis of physical evidence, which falls under the clear letter and intent of the rule's notice and disclosure requirements. *See State v. Schwartz*, 447 N.W.2d 422, 427 (Minn.1989) (holding that because forensic

samples are often so small that the entire sample must be used to procure a reliable result, access to the data, methodology, and actual results of the state's DNA tests is crucial for the defendant to have at least an opportunity for independent expert review) *reh'g denied* (Minn., Dec. 11, 1989); *State v. Smith*, 367 N.W.2d 497, 502 (Minn.1985) (concluding the prosecutor's failure to disclose that it possessed a latent fingerprint that had been left in the victim's living room and that matched defendant's known prints clearly violated the disclosure requirement contained in Minn.R.Crim.P. 9.01, subd. 1(4)); *State v. Mattson*, 359 N.W.2d 616, 618 (Minn.1984) (resolving that the state complied with its disclosure obligation under Minn.R.CrimP. 9.01, subd. 1(4) by providing defendant with a copy of the controlled substance testing report prepared by the state's chemist); *State v. Caldwell*, 322 N.W.2d 574, 584 (Minn.1982) (stating Minn.R.Crim.P. 9.01, subd. 1(4) requires the prosecutor to disclose and provide defendant access to results or reports of fingerprint identification); *State v. Moss*, 262 N.W.2d 422, 424 (Minn.1978) (requiring disclosure of report of blood tests under Minn. R.Crim.P. 9.01, subd. 1(4)).

priate remedy and has wide discretion in deciding whether to impose sanctions. *State v. Lindsey*, 284 N.W.2d 368, 373 (Minn.1979), *reh'g denied* (Minn., Sept. 11, 1979). In exercising its discretion, the court should consider all relevant factors, including the reason why notice was not given and the extent to which the violation prejudiced the opposing party. *See State v. Smith*, 367 N.W.2d 497, 502 (Minn.1985). Absent a clear abuse of discretion, a reviewing court will not overturn the trial court's decision. *State v. Lindsey*, 284 N.W.2d at 373. Furthermore, although Freeman correctly contends that Minnesota discovery provisions are stricter, in some respects, than their federal counterparts, the preclusion of evidence is a severe sanction that should not be lightly invoked. *State v. Kaiser*, 486 N.W.2d 384, 386 (Minn. 1992); *State v. Rasinski*, 472 N.W.2d 645, 649 (Minn.1991); *State v. Lindsey*, 284 N.W.2d at 374.

■ One of the objectives pretrial discovery serves is to avoid surprise. *State v. Lindsey*, 284 N.W.2d at 372. Within one day of his arrest, Freeman told Chief Public Defender Friedman that he wanted the police to inspect his car to verify his alibi that his car's malfunctioning prevented him from driving from White Bear Lake to Duluth. Because Freeman maintained from the time of his arrest that he had experienced car difficulties, it is unlikely that he was surprised by the state's evidence relating to his car's condition.

The state expedited its inspection of Freeman's car in an attempt to verify Freeman's alibi. Nothing in the record indicates that the state acted in bad faith in failing to give Freeman notice prior to inspecting his car, and nothing indicates that the state denied Freeman's automotive expert access to the car. Although Freeman had been given permission on February 26, 1993, to inspect the car, Freeman waited until September 8, 1993, to have his automotive expert, Williams, inspect the car for the first time. Freeman fails to explain why he delayed in attempting to inspect the car.

Notwithstanding Freeman's delay, the state provided Williams with copies of or access to various police reports, automotive

inspection reports, and the narrated videotape taken during the state's inspection of Freeman's car. That material allowed Freeman to cross-examine the state's automotive expert, Brand, on his testing procedure and also allowed Freeman to rebut the propriety of Brand's testing procedure with the testimony of Williams. Williams was able to opine at trial that the corrosion he observed on the battery cables of Freeman's car could have caused voltage fluctuations that would have manifested themselves in a manner consistent with Freeman's description of his car's malfunctioning.

Freeman's ability to cross-examine Brand, as well as his ability to present Williams's testimony in rebuttal, remedied the state's failure to give Freeman notice prior to inspecting his car. Notwithstanding any real or hypothesized malfunctions, both automotive experts concluded that Freeman's car could have been successfully driven round-trip from White Bear Lake to Duluth on the night of January 29, 1993. Thus, even if the state had provided Freeman with notice prior to inspecting his car, the results of any additional tests conducted at that time, at most, would have merely served to corroborate Freeman's description of his car's malfunctioning condition. Comparable corroboration resulted from Williams's testimony and from Freeman's cross-examination of Brand. Moreover, any additional tests would not have addressed the state's contention that Freeman's car was capable of being driven round-trip from White Bear Lake to Duluth. Considering the relevant factors, we conclude that the trial court did not abuse its discretion in refusing to exclude the state's evidence that Freeman's car was operable.

**II.**

■ Even if Freeman's contention that the trial court abused its discretion had merit, that error was harmless beyond a reasonable doubt. To remedy a discovery violation, a reviewing court ordinarily should not order a new trial if no reasonable probability exists that the outcome of the trial would have been different if the evidence had been available. *State v. Clobes*, 422 N.W.2d 252, 255 (Minn. 1988), *reh'g denied* (Minn., May 9, 1988).

The state's evidence relating to the condition of Freeman's car might have undermined the credibility of Freeman's alibi defense. Once again, however, both automotive experts concluded that Freeman's car could have been successfully driven round-trip from White Bear Lake to Duluth. Moreover, a great deal of properly admitted evidence linked Freeman to the killing, and overall, we consider the trial court's rulings on evidentiary objections to have been fair and even-handed. Thus, if the court abused its discretion in admitting the evidence, the jury would not have arrived at a different verdict had the evidence not been admitted, and any error was harmless.

### III.

■ Freeman also requests that we grant him a new trial in the interests of justice. Even when prejudice to the defendant is not clear, this court, on limited occasion, has awarded a new trial in the exercise of its supervisory powers "in the interests of justice." *See State v. Kaiser,* 486 N.W.2d 384, 387 (Minn.1992) (conceding that it was arguable whether the defense was prejudiced by the prosecutor's failure to disclose potentially exculpatory evidence, but nevertheless, awarding a new trial, "in the interests of justice," when the prosecutor's failure to comply with the discovery rules was clear); *State v. Schwantes,* 314 N.W.2d 243, 245 (Minn.1982) (awarding a new trial "in the interests of justice" because of prosecutor's negligent failure to disclose information useful to defendant in deciding whether to waive marital privilege, even though the evidence of defendant's guilt was strong).

Although this court has ordered a new trial in the interests of justice even when the prosecutor's failure to comply with the discovery rules was inadvertent, prophylactic reversals in the interest of justice have been limited to circumstances in which the prosecution's failure to comply with the discovery rules is clear. *See, e.g., State v. Kaiser,* 486 N.W.2d at 387; *State v. Schwantes,* 314 N.W.2d at 245. In the present case, it is unclear that a discovery violation has occurred. In addition, the state commendably attempted to preserve the condition of Free-

man's car. Finally, Freeman failed to have his own expert inspect his car until more than seven months after the state's inspection. All of these factors support our conclusion that a new trial is not needed in the interests of justice.

Affirmed.